**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AMERICAN FREEDOM DEFENSE INITIATIVE; PAMELA GELLER; and ROBERT SPENCER, | Case No. 1:14-cv-10292-NMG |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF REASONS FOR GRANTING PRELIMINARY INJUNCTION** |
| -v.- | |
| MASSACHUSETTS BAY TRANSPORTATION AUTHORITY ("MBTA"); and BEVERLY A. SCOTT, individually and in her official capacity as Chief Executive Officer / General Manager of the MBTA, | [Fed. R. Civ. P. 65] |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES .............................................................................................. ii

INTRODUCTION ...............................................................................................................1

STATEMENT OF FACTS ..................................................................................................2

ARGUMENT .......................................................................................................................7

I.   Standard for Issuing a Preliminary Injunction .........................................................7

II.  Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment Claim...................8

    A.  Plaintiffs' Advertisement Is Protected Speech .................................................9

    B.  The Court Has Ruled that Defendants Created a Limited Public Forum ...........................9

    C.  Defendants' Speech Restriction Was Unreasonably Applied............................................10

        1.  The Legal Standard ..............................................................................................10

        2.  The Speech Restriction Unreasonably Applied .........................................................11

III. Plaintiffs Will Suffer Irreparable Harm in the Absence of an Injunction...............................15

IV. The Balance of Equities Tips Sharply in Favor of Granting the Injunction ...........................15

V.  Granting the Injunction Is in the Public Interest.....................................................15

REQUEST FOR ORAL ARGUMENT .........................................................................................16

CONCLUSION...................................................................................................................16

CERTIFICATE OF SERVICE .................................................................................................17

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

*Am. Freedom Def. Initiative v. Mass. Bay Transp. Auth.*,
No. 1:13-cv-12803-NMG, 2013 U.S. Dist. LEXIS 179729 (D. Mass. Dec. 20, 2013).........*passim*

*Am. Freedom Def. Initiative v. Metro. Transp. Auth.*,
880 F. Supp. 2d 456 (S.D.N.Y. 2012)....................................................................................8, 12

*Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*,
898 F. Supp. 2d 78 (D.D.C. 2012).............................................................................................12

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963)......................................................................................................................8

*Cornelius v. NAACP Legal Def. & Educ. Fund*,
473 U.S. 788 (1985)....................................................................................................................9

*Dayton Area Visually Impaired Persons, Inc. v. Fisher*,
70 F.3d 1474 (6th Cir. 1995) ....................................................................................................15

*Desert Outdoor Adver., Inc. v. City of Moreno Valley*,
103 F.3d 814 (9th Cir. 1996) ....................................................................................................14

*Elrod v. Burns*,
427 U.S. 347 (1976)..................................................................................................................15

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*,
23 F.3d 1071 (6th Cir. 1994) ....................................................................................................15

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013)..................................................................................................15

*Hill v. Colo.*,
530 U.S. 703 (2000)....................................................................................................................9

*Homans v. City of Albuquerque*,
264 F.3d 1240 (10th Cir. 2001) ................................................................................................15

*Iowa Right to Life Comm., Inc. v. Williams*,
187 F.3d 963 (8th Cir. 1999) ....................................................................................................15

*Lebron v. Wash. Metro. Area Transit Auth.*,
749 F.2d 893 (D.C. Cir. 1984) ...................................................................................................8

*Maceira v. Pagan,*
649 F.2d 8 (1st Cir. 1981) ......................................................................................15

*Newsom v. Norris,*
888 F.2d 371 (6th Cir. 1989) ..................................................................................15

*Perry Educ. Ass'n v. Perry Local Educators,*
460 U.S. 37 (1983) ............................................................................................10, 14

*Ridley v. Mass. Bay Transp. Auth.,*
390 F.3d 65 (1st Cir. 2004) ............................................................................ *passim*

*Rosenberger v. Rector & Visitors of the Univ. of Va.,*
515 U.S. 819 (1995) .................................................................................................10

*Sindicato Puertorriqueño de Trabajadores v. Fortuño,*
699 F.3d 1, 10 (1st Cir. 2012) ...................................................................................8

*United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.,*
163 F.3d 341 (6th Cir. 1998) ...............................................................................9, 14

*Winter v. Natural Res. Def. Council, Inc.,*
555 U.S. 7 (2008) .......................................................................................................8

**Statutes**

8 U.S.C. § 1101(a)(42)................................................................................................4

42 U.S.C. § 1983 .......................................................................................................5

## INTRODUCTION

This motion for preliminary injunction, and indeed the case in its entirety, comes before the court dressed *in part* in the factual garments previously laundered and folded by this court and then carefully packed into the legal baggage originally designed by the First Circuit in *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65 (1st Cir. 2004). *See Am. Freedom Def. Initiative v. Mass. Bay Transp. Auth.*, No. 1:13-cv-12803-NMG, 2013 U.S. Dist. LEXIS 179729 (D. Mass. Dec. 20, 2013), *appeal docketed*, No. 14-1018 (1st Cir. Jan. 6, 2014) ("*MBTA I*"). In this case, however, Plaintiffs have been careful to tailor all of their *new* factual dress, and thus their claims, to fit neatly into *Ridley*'s baggage while devoutly honoring the rationale of this court's ruling in *MBTA I*.

The point of this exercise is neither recreational nor irreverently contentious, but rather fundamental to our liberties—indeed to our first liberty. So it is that while Plaintiffs continue to respectfully plead that *Ridley*'s legal baggage of a limited public forum was either wrongly applied in *MBTA I*, or wrongly decided by the First Circuit in the first instance, in this motion Plaintiffs seek to understand and to test the boundaries of an amorphous civility standard that fantastically stands on the difference between the word usage of a noun (*i.e.*, savage) and an adjective phrase (*i.e.*, those who engage in savage acts). Thus, accepting for purposes of this motion that the advertising panels on MBTA[1] buses are a limited public forum, Plaintiffs here assert that the MBTA's decision to reject their most recently proposed advertisement ("AFDI Advertisement III") is patently unreasonable in light of this court's rationale in *MBTA I*. This unreasonableness compels a finding that Defendants violated the Constitution by rejecting Plaintiffs' advertisement.

---

[1] "MBTA" refers specifically to the Massachusetts Bay Transportation Authority, and in context, to Defendants collectively.

## STATEMENT OF FACTS

Plaintiff AFDI is an organization that is incorporated under the laws of the State of New Hampshire.  AFDI is a human rights organization dedicated to freedom of speech, freedom of conscience, freedom of religion, freedom from religion, and individual rights.  AFDI achieves its objective through a variety of lawful means, including through the exercise of its right to freedom of speech under the United States Constitution.  (Geller Decl. at ¶¶ 3, 5, 6 at Ex. 1).

AFDI exercises its right to freedom of speech and promotes its objectives by, *inter alia*, purchasing advertising space on transit authority property in major cities throughout the United States, including Boston, Massachusetts.  AFDI purchases these advertisements to express its message on current events and public issues, including the Israeli / Palestinian conflict (hereinafter referred to as "AFDI's advertising campaign").  (Geller Decl. at ¶ 7 at Ex. 1).

Plaintiff Geller is the president of AFDI, and Plaintiff Spencer is the vice president.  Plaintiffs Geller and Spencer engage in protected speech through AFDI's activities, including AFDI's advertising campaign.  (Geller Decl. at ¶¶ 2, 4 at Ex. 1).

The MBTA is a quasi-governmental organization which provides public transportation in the Commonwealth of Massachusetts.  It operates bus routes, subway lines, a commuter rail network, and ferry service routes that provide transportation to millions of customers in the Greater Boston area.  Defendant Scott is the CEO / General Manager of the MBTA and the final decision maker responsible for enforcing the MBTA Advertising Guidelines and for ultimately rejecting Plaintiffs' proposed advertisement at issue here (*i.e.*, AFDI Advertisement III).  (Geller Decl. at ¶¶ 8, 28-30, 41 at Ex. 1).

The MBTA, through its advertising agent, Titan Outdoor LLC (a/k/a Titan360 and Titan) (hereinafter "Titan"), leases space on its vehicles and transportation stations for use as

advertising space.  (Geller Decl. at ¶ 9 at Ex. 1).

As a matter of policy and practice, the MBTA accepts commercial and noncommercial advertisements for display on its advertising space, including noncommercial public service, public issue, and political issue advertisements, including advertisements providing political and social commentary on controversial issues such as the Israeli / Palestinian conflict.  (Geller Decl. at ¶¶ 10-12, 14-21, 34-36 at Ex. 1).

Accordingly, the MBTA permits, as a matter of policy and practice, a wide variety of commercial, noncommercial, public-service, public-issue, and political-issue advertisements on its advertising space, including advertisements addressing the hotly debated Israeli / Palestinian conflict (hereinafter "Speech Policy").  (Geller Decl. at ¶¶ 10-12, 14-21, 34-36 at Ex. 1).

In October 2013 and pursuant to their Speech Policy, Defendants accepted for display on the MBTA advertising space a controversial advertisement that addresses the Israeli / Palestinian conflict from a viewpoint that criticizes Israel (hereinafter "Anti-Israel Advertisement").  (Geller Decl. at ¶¶ 14-19 at Ex. 1).

The Anti-Israel Advertisement, which appeared on approximately 80 posters throughout the transit system, depicts four maps that purport to show the "***Palestinian loss of land***" to Israel between 1946 and 2010.  Text accompanying the maps says: "***4.7 million Palestinians are Classified by the UN as Refugees***."  (Geller Decl. at ¶¶ 16-18 at Ex. 1).

After receiving a rash of complaints, on or about October 31, 2013, Defendants, acting through the MBTA's advertising agent, removed all of the Anti-Israel Advertisements from the MBTA's advertising space.  (Geller Decl. at ¶ 20 at Ex. 1).

However, on or about November 1, 2013, Defendants decided, without much of a public explanation, except to claim that it was a "miscommunication" between the MBTA and its

advertising agent, to repost the Anti-Israel Advertisement on the MBTA's advertising space.[2] (Geller Decl. at ¶ 21 at Ex. 1).

Pursuant to Defendants' Speech Policy and *in direct response to* the original posting of the Anti-Israel Advertisement, on or about October 26, 2013, Plaintiffs submitted to Titan for display on the MBTA's advertising space an advertisement that supported Israel in the debate over the Israeli / Palestinian conflict.  More specifically, Plaintiff Geller sent an email to Scott Goldsmith, the executive vice president and chief commercial officer of Titan, and requested to run AFDI's "pro-Israel ads in 10 of the Boston T stations where the anti-Israel campaign is running."  (Geller Decl. at ¶ 22 at Ex. 1).

AFDI's pro-Israel advertisement ("AFDI Advertisement I") states, in relevant part: "*In any war between the civilized man and the savage, support the civilized man.  Support Israel. Defeat jihad*."  (Geller Decl. at ¶¶ 23-24 at Ex. 1).

AFDI Advertisement I discusses the same subject matter as the Anti-Israel Advertisement, except it does so from a viewpoint that favors Israel.  And the advertisement's quote, "In any war between the civilized man and the savage, support the civilized man," is

---

[2] The Anti-Israel Advertisement describes the Palestinians as "refugees," which, according to the United Nation's definition of "refugee," means, in the context of the advertisement, that the Israelis are *persecuting* the Palestinians on account of their "race, religion, nationality, membership of a particular social group or political opinion."  *See* http://www.unhcr.org/pages/49c3646c125.html (providing U.N. definition of "refugee") (last visited on Feb. 6, 2014); *see also* 8 U.S.C. § 1101(a)(42) (defining "refugee" as unable to return to one's national homeland "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion").  This is not a "positive" message by any man's measure.  Indeed, the Anti-Israel Advertisement created a firestorm of complaints, which then caused the MBTA (or its advertising agent) to take it down, only to be reposted soon thereafter.  (Geller Decl. at ¶¶ 20-21 at Ex. 1).  The MBTA apparently has no concern that its "ridership" is offended by the Anti-Israel Advertisement, demonstrating further the viewpoint-based nature of Defendants' speech restriction here.  *See, e.g., Ridley*, 390 F.3d at 87 (noting that impermissible discrimination is evidenced when the government "rejects something because of a certain characteristic, but other things possessing the same characteristics are accepted").

adapted from a quote by the famous Russian-born, American author of *Atlas Shrugged*, Ayn Rand.[3]  (Geller Decl. at ¶¶ 25-26 at Ex. 1).

The message of AFDI Advertisement I was timely when it was submitted, and it remains so today in light of the fact that the Anti-Israel Advertisement received substantial publicity, and the issues addressed by the two competing advertisements remain current.  Indeed, the President of the United States made special mention of the Israel / Palestinian conflict during the recent 2014 State of the Union address.  (Geller Decl. at ¶ 27 at Ex. 1).

On November 4, 2013, Defendants made a formal determination and officially rejected AFDI Advertisement I because it allegedly "falls within the category (b)(i) 'Demeaning or disparaging.'"[4]  (Geller Decl. at ¶¶ 29-30 at Ex. 1).

As a result of Defendants' restriction on Plaintiffs' speech, Plaintiffs filed suit in this court pursuant to 42 U.S.C. § 1983, alleging violations of the First Amendment (freedom of speech) and Fourteenth Amendment (equal protection and due process).  *See Am. Freedom Def. Initiative v. Mass. Bay Transp. Auth.*, No. 1:13-cv-12803-NMG (D. Mass. filed Nov. 6, 2013) ("*MBTA I*").[5]

In denying Plaintiffs' motion for preliminary injunction in *MBTA I*, the court ruled that while the most reasonable interpretation of the word "jihad" in context was understood to implicate only violent terrorism, the MBTA's interpretation to include even peaceful or pietistic

---

[3] "Savage" in the context of the advertisement, which juxtaposes the term with "civilized," means "uncivilized."  *See, e.g.,* http://www.merriam-webster.com/dictionary/savage (defining "savage") (last visited on Feb. 6, 2013).  However, using the term "savage" not only brings to mind the famous quote from Ayn Rand, but it *effectively* conveys Plaintiffs' viewpoint on the issue.  Altering the message would alter its meaning, especially in context, and thus alter Plaintiffs' viewpoint.  *See, e.g.*, n.6 *infra*.

[4] Attached to Defendants' email rejecting the AFDI Advertisement was a copy of the MBTA's Advertising Guidelines.  (Geller Decl. at ¶¶ 29-30 at Ex. 1).

[5] Pending appeal, this court stayed all discovery and other pretrial deadlines in *MBTA I*.  (Geller Decl. at ¶ 33 at Ex. 1).

jihad and together with the word "savage" could be reasonably understood to disparage all

Muslims and Palestinians:

> The Court finds that the meaning of the AFDI Pro-Israel Advertisement is not as clear as plaintiffs assert. In fact, the advertisement is ambiguous in several respects. For instance, "war" could refer, as plaintiffs claim, to the violent acts committed against innocent Israeli citizens. But the term might also refer to the periodic conflicts between Israel and its majority-Muslim neighbors in Egypt, the Gaza Strip, the West Bank and Lebanon. Finally, the term could refer to the metaphysical or ideological struggle between Islam and the West.
>
> Similarly, "jihad" is susceptible to several interpretations. Plaintiffs are correct that it is commonly interpreted (by this judicial officer among others) as referring to the acts of radical Islamic terrorists. Jihad is also understood by many, however, to have a more nuanced meaning that emphasizes a duty of introspection and self-improvement over violence applicable to all Muslims. Dictionary definitions of the term do not resolve the ambiguity. *See* Oxford English Dictionary (2d ed. 2012) ("A religious war of Muslims against unbelievers in Islam, inculcated as a duty by the Koran and traditions"; "a war or crusade for or against some doctrine, opinion or principle"; "war to the death"); Webster's Third New International Dictionary (2002) ("a holy war waged on behalf of Islam as a religious duty"; "a bitter strife or crusade undertaken in the spirit of a holy war"); Webster's II New College Dictionary (3d ed. 2005) ("a Muslim holy war or spiritual struggle against infidels"; "a crusade"; "a struggle").
>
> Nevertheless, the Court agrees with the plaintiffs that the most reasonable interpretation of their advertisement is that they oppose acts of Islamic terrorism directed at Israel. Thus, if the question before this Court were whether the MBTA adopted the best interpretation of an ambiguous advertisement, it would side with the plaintiffs. But restrictions on speech in a non-public forum need only be reasonable and need not be the most reasonable. *See Ridley*, 390 F.3d at 90. In this case, the Court understands the inquiry to require only that the MBTA reasonably interpret the ambivalent advertisement. In light of the several divergent interpretations, it was plausible for the defendants to conclude that the AFDI Pro-Israel Advertisement demeans or disparages Muslims or Palestinians.

*MBTA I,* 2013 U.S. Dist. LEXIS 179729, at *16–*18.

After a careful review of this court's ruling in *MBTA I*, Plaintiffs submitted a new

proposed advertisement to the MBTA ("AFDI Advertisement II"), which states, in relevant part:

"***In any war between the civilized man and those engaged in savage acts, support the civilized***

***man. Defeat Violent Jihad. Support Israel.***" AFDI Advertisement II appears as follows:



(Geller Decl. at ¶¶ 34-35 at Ex. 1).   On January 7, 2014, Defendants accepted AFDI Advertisement II.  (Geller Decl. at ¶ 36 at Ex. 1).

On January 8, 2014, Plaintiff Geller submitted a slightly revised version of AFDI Advertisement II to the MBTA for approval ("AFDI Advertisement III").  This advertisement states, in relevant part: "*In any war between the civilized man and the savage, support the civilized man.  Defeat <u>violent</u> jihad.  Support Israel.*"  AFDI Advertisement III appears as follows:



(Geller Decl. at ¶¶ 37-38 at Ex. 1).  After the MBTA notified Plaintiffs of its initial rejection of AFDI Advertisement III, the MBTA provided its written Formal Determination on January 29, 2014, rejecting the advertisement "based on the same considerations as its rejection of [AFDI Advertisement I]."  (Geller Decl. at ¶¶ 39-41 at Ex. 1).  This lawsuit follows.

**ARGUMENT**

**I.     Standard for Issuing a Preliminary Injunction.**

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in

the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Plaintiffs

satisfy this standard.  Moreover, when, as here, a party seeks a preliminary injunction on the

basis of the potential violation of the First Amendment, "the likelihood of success on the merits

is the lynchpin of the preliminary injunction analysis." *MBTA I*, 2013 U.S. Dist. LEXIS 179729,

at *9-*10 (quoting *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st

Cir. 2012)).

## II.     Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment Claim.

Plaintiffs' First Amendment claim is reviewed in essentially three steps.  First, the court

must determine whether the speech in question—Plaintiffs' advertisement—is protected speech.

Second, the court must conduct a forum analysis as to the forum in question to determine the

proper constitutional standard to apply.  And third, the court must then determine whether

Defendants' speech restriction comports with the applicable standard.  *Am. Freedom Def.*

*Initiative v. Metro. Transp. Auth.*, 880 F. Supp. 2d 456, 466 (S.D.N.Y. 2012) (analyzing a free

speech claim in "three parts"); *cf. Ridley*, 390 F.3d at 75 (conducting a forum analysis in a

challenge to the MBTA's restrictions on several advertisements, but stating, "[p]ublic forum

analysis itself has been criticized as unhelpful in many contexts, and particularly this one where

the government is operating a commercial enterprise earning income from permitting

advertising").  Moreover, Defendants' "refusal to accept [AFDI Advertisement III] for display

because of its content is a clearcut *prior restraint*." *Lebron v. Wash. Metro. Area Transit Auth.*,

749 F.2d 893, 896 (D.C. Cir. 1984) (Bork, J.) (emphasis added).  And "[a]ny system of prior

restraints of expression comes to this Court bearing a *heavy presumption* against its

constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963) (collecting

cases) (emphasis added).

### A.    Plaintiffs' Advertisement Is Protected Speech.

The first question is easily answered.  Sign displays constitute protected speech under the First Amendment, *Hill v. Colo.*, 530 U.S. 703, 714-15 (2000) ("[S]ign displays . . . are protected by the First Amendment."), and this includes signs posted on transit advertising space, *see Ridley*, 390 F.3d at 65; *see also United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341 (6th Cir. 1998) (hereinafter "*United Food*"); *see generally MBTA I*, 2013 U.S. Dist. LEXIS 179729, at *13 (treating Plaintiffs' AFDI Advertisement I as political speech and stating that "[i]n order to pass constitutional muster, a restriction on speech in a non-public forum must be reasonable").

### B.    The Court Has Ruled that Defendants Created a Limited Public Forum.

"The [Supreme] Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for [expressive] purposes."  *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 800 (1985).  Forum analysis has traditionally divided government property into three categories: traditional public forums, designated public forums, and nonpublic forums.  *Cornelius*, 473 U.S. at 800.  The First Circuit has "adopt[ed] the usage equating limited public forum with non-public forum."  *Ridley*, 390 F.3d at 76 n.4.  Once the forum is identified, the court must then determine whether the speech restriction is justified by the requisite standard.  *Id.*

As noted above, while Plaintiffs continue to challenge this court's application of *Ridley* to the facts in *MBTA I*, or, if properly applied, *Ridley*'s ruling that the MBTA may constitutionally pick and choose between controversial messages addressing the same subject matter based upon a vaguely worded and obtusely applied civility standard, for purposes of this motion Plaintiffs

accept that we are dealing with a limited public forum packed into and bound by the legal holdings of *Ridley* and *MBTA I.*

### C.    Defendants' Speech Restriction Was Unreasonably Applied.

#### 1.    The Legal Standard.

In a limited public forum, as in a nonpublic forum, the government "may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n v. Perry Local Educators,* 460 U.S. 37, 46 (1983).  Thus, in a limited public forum, a speech restriction must be reasonable and viewpoint neutral to pass constitutional muster.  *Id.*

Moreover, once the government "has opened a limited forum, [it] must respect the lawful boundaries it has itself set." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).  Accordingly, in a limited public forum, "[t]he State may not exclude speech where its distinction is not reasonable in light of the purpose served by the forum, nor may it discriminate against speech on the basis of its viewpoint." *Id.* at 829 (internal citations and quotations omitted).  "Thus, in determining whether the State is acting to preserve the limits of the forum it has created so that the exclusion of a *class of speech* is legitimate, we have observed a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible *when directed against speech otherwise within the forum's limitations*." *Id.* at 829-30 (emphasis added).

Finally, even if the speech restriction is facially reasonable in light of the purpose served by the forum, it must be reasonably applied in the case at bar.  *Ridley*, 390 F.3d at 66; *MBTA I,*

2013 U.S. Dist. LEXIS 179729, at *14-*15 ("*Ridley* acknowledged that deciding whether an advertisement is demeaning or disparaging involves 'some degree of interpretation.' The fact that the standard requires the MBTA to exercise some discretion does not mean that the Court is required to accept whatever decision it reaches. Instead, the Court must examine the MBTA's basis for rejecting the AFDI Pro-Israel Advertisement to determine if its conclusions were reasonable.") (internal citation omitted).

**2.     The Speech Restriction Unreasonably Applied.**

The MBTA Formal Determination informs us that AFDI Advertisement III was rejected based upon the same considerations the MBTA applied to reject AFDI Advertisement I. Presumably, Defendants consider AFDI Advertisement III to be demeaning of all Muslims and Palestinians because the word "savage" demeans those who oppose Israel, including those who do not resort to or promote the use of violent jihad. But given the content and context of AFDI Advertisement III, and given this court's reasoning in *MBTA I*, this interpretation is not only unreasonable as applied, it points rather indelicately to the MBTA's lack of an objective standard in applying this "civility" standard.

To flush this as-applied challenge out a bit, we return to this court's reasoning in *MBTA I* and retreat one step to examine AFDI Advertisement II in that context. Following *Ridley*'s rationale, this court's opinion in *MBTA I* pointed out that, given the predicate of a limited public forum, while the MBTA might not necessarily bring to bear the most reasonable interpretation of an advertisement, there must be some objective analysis that leads reasonably to the conclusion that an advertisement is demeaning. *Id*.

While the MBTA did not explain its rationale for its rejection of AFDI Advertisement I beyond the claim that the advertisement was demeaning, in its opposition to Plaintiffs' motion

for preliminary injunction, the MBTA claimed that the advertisement insulted all Muslims and Palestinians, citing the rationale of both *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 880 F. Supp. 2d 456, 467 (S.D.N.Y. 2012) and *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 898 F. Supp. 2d 78, 79 (D.D.C. 2012).  *See* Opp'n Br. of MBTA at 12-13, *Am. Freedom Def. Initiative*, No. 1:13-cv-12803-NMG (D. Mass. Nov. 21, 2013), ECF No. 19.

Indeed, in *MBTA I*, this court accepted this rationale—while not the most reasonable interpretation—as at least one possible interpretation given the ambiguities inherent in the words "war" and "jihad."  *MBTA I*, 2013 U.S. Dist. LEXIS 179729, at *15-*18.  Specifically, the court proceeded with the implicit premise set out explicitly later in its opinion that the term "savage" presumptively "debases [a] person's dignity."  *Id.* at *25-*26.  With this premise in mind, the court noted that a "war" between civilized men and savages might be a kinetic violent war or it might also be something more metaphorical and thus non-violent.  Further, because the word "jihad" may be defined as a non-violent struggle, it was not unreasonable, the court reasoned, for the MBTA to interpret AFDI Advertisement I as labeling all Muslims and Palestinians as savages insofar as the advertisement might sweep in those who oppose Israel peacefully, politically, and ideologically.  *Id.*  Again, implicit in the court's decision is that to label these non-violent opponents of Israel as savages would be demeaning.  *Id.*

With this legal analysis front and center, Plaintiffs submitted AFDI Advertisement II to the MBTA.  This advertisement removed the ambiguity from the word "jihad" by making explicit that the jihad Plaintiffs' political speech refers to is "*violent* jihad."  Beyond this change, Plaintiffs modified the noun "savage" to an adjective to describe "those engaged in savage acts."  The MBTA accepted this advertisement, apparently concluding that the adjective clause ("those who engage in savage acts") was not referring to peaceful Muslims or Palestinians, but only

those engaged in the savage act of _violent_ jihad.

In an effort to understand the reasonableness of the MBTA's application of its "civility" speech restriction and to more adequately express Plaintiffs' viewpoint that those Palestinians and Muslims who engage in the savage act of _violent_ jihad are, by virtue of their savagery, savages, Plaintiffs submitted AFDI Advertisement III.  This advertisement retains the clarity of AFDI Advertisement II that the political speech at issue refers to the _violent_ jihad employed by terrorists who, juxtaposed against the civilized man, are properly delineated as savages.  The MBTA, however, somehow concluded that AFDI Advertisement III demeaned all Muslims and Palestinians in the same way or for the same "considerations" as AFDI Advertisement I.

The only distinction between AFDI Advertisements II and III is the distinction between the noun "savage" and the adjective phrase "those who engage in savage acts."  But this begs the question: how does one identify the savage if not by his savage acts?  And more important, is it constitutionally reasonable for a government agency to conclude that AFDI Advertisement III is somehow more demeaning because it expresses Plaintiffs' viewpoint that those engaged in savage acts (_i.e._, "**_violent_** jihad") are savages?

And this points to a more fundamental constitutional infirmity of the MBTA's "civility" standard.  Having opened up its forum to a rancorous debate over the violent relations between Israeli Jews and Muslim Palestinians, the MBTA is left to carve and craft in an _ad hoc_ fashion what kind of political speech on this controversial and highly emotional subject matter crosses some invisible line of civility.  This entirely subjective and arbitrary standard is now laid bare as the MBTA tries to explain how there is a constitutionally reasonable distinction (one that must be objective) between "those who engage in savage acts" and the "savage" who, by definition, engages in savage acts (_i.e._, "**_violent_** jihad")—unless, of course, the MBTA rejects simply

Plaintiffs' viewpoint that acts of "violent jihad" against Israeli Jews are savage acts—a position which would also violate the First Amendment, as well as commonsense and decency. *Perry Educ. Ass'n,* 460 U.S. at 46 (prohibiting viewpoint-based restrictions in a nonpublic forum).[6]

As the court noted in *MBTA I,* "The MBTA, in deciding to open its advertising program to speech on controversial topics, has taken on the difficult task of determining whether speech on that topic crosses the line from being offensive or hurtful to being demeaning or disparaging such that it can be excluded from the forum." *MBTA I,* 2013 U.S. Dist. LEXIS 179729, at *26-*27. Thus, what we have discovered is that while AFDI Advertisement I "presents a close call," *see id.* at 27, AFDI Advertisements II and III expose the MBTA's close call as an unreasonable and arbitrary (and thus unconstitutional) line-drawing that defies any objective logic because it is nothing less than a fear that the noun "savage" somehow expresses the dispositively reasonable definitional viewpoint that the violent jihadist is a savage precisely because his actions define him as such. *See, e.g., United Food,* 163 F.3d at 359 (holding that a speech restriction "offends the First Amendment when it grants a public official 'unbridled discretion' such that the official's decision to limit speech is not constrained by *objective criteria,* but may rest on 'ambiguous and subjective reasons'") (quoting *Desert Outdoor Adver., Inc. v. City of Moreno Valley,* 103 F.3d 814, 818 (9th Cir. 1996)) (emphasis added).

---

[6] In *Ridley,* the court held that the MBTA's restriction on advertisements that were critical of laws prohibiting drug use were viewpoint based in violation of the First Amendment. The MBTA attempted to avoid the fact that its restriction was viewpoint based by arguing that a similar message could run *if a different manner of expression was used.* The court rejected the argument, stating,

> The MBTA's concession means simply that it will run advertisements which do not attract attention but will exercise its veto power over advertisements *which are designed to be effective in delivering a message.* Viewpoint discrimination concerns arise when the government intentionally tilts the playing field for speech; *reducing the effectiveness of a message,* as opposed to repressing it entirely, thus may be *an alternative form of viewpoint discrimination.*

*Ridley,* 390 F.3d at 88 (emphasis added).

In sum, the MBTA's rejection of AFDI Advertisement III violates the First Amendment.

**III.    Plaintiffs Will Suffer Irreparable Harm in the Absence of an Injunction.**

It is well established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" sufficient to justify injunctive relief. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Maceira v. Pagan*, 649 F.2d 8, 18 (1st Cir. 1981) (same); *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) ("The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.") (citing *Elrod*).

**IV.    The Balance of Equities Tips Sharply in Favor of Granting the Injunction.**

The likelihood of harm to Plaintiffs without the injunction is substantial because the deprivation of First Amendment rights, even for minimal periods, constitutes irreparable injury. *See* sec. III. *supra*.  On the other hand, if the MBTA is enjoined from enforcing its prior restraint on Plaintiffs' speech, it will suffer no harm because the exercise of constitutionally protected rights can never harm any of the MBTA's legitimate interests.  *See* sec. V. *infra.*

**V.    Granting the Injunction Is in the Public Interest.**

The public interest is best served by upholding First Amendment freedoms.  *See Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995) ("[T]he public as a whole has a significant interest in . . . protection of First Amendment liberties . . . ."); *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."); *Iowa Right to Life Comm., Inc. v. Williams*, 187 F.3d 963, 970 (8th Cir. 1999) ("[The] public interest favors protecting core First Amendment freedoms. . . ."); *Homans v. City of Albuquerque*, 264 F.3d 1240, 1244 (10th Cir. 2001) (same); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)

("[E]nforcement of an unconstitutional law is always contrary to the public interest.").  Thus, the public interest favors granting the requested injunction.

## REQUEST FOR ORAL ARGUMENT

Oral argument will assist this court in reaching a full understanding of the important constitutional issues presented and the underlying facts, and it will allow the attorneys for both sides to address any outstanding legal or factual issues that this court deems relevant.

## CONCLUSION

Plaintiffs respectfully request that the court preliminarily enjoin the MBTA's prior restraint on their speech, thereby permitting the display of AFDI Advertisement III.

Respectfully submitted,

/s/ Robert Snider
Robert Snider, Esq. (BBO#471000)
11 Cahill Park Drive
Framingham, Massachusetts 01702
robert.snider20@gmail.com
Tel/Fax: (508) 875-0003

**AMERICAN FREEDOM LAW CENTER**

/s/ David Yerushalmi
David Yerushalmi, Esq.* (DC # 978179)
1901 Pennsylvania Avenue NW, Suite 201
Washington, D.C. 20006
dyerushalmi@americanfreedomlawcenter.org
Tel: (646) 262-0500; Fax: (801) 760-3901

/s/ Robert J. Muise
Robert J. Muise, Esq.* (MI P62849)
P.O. Box 131098
Ann Arbor, Michigan 48113
rmuise@americanfreedomlawcenter.org
Tel: (734) 635-3756; Fax: (801) 760-3901

*Subject to admission *pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 10, 2014, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.   Parties may access this filing through the Court's system.   I further certify that, prior to the filing of a notice of appearance by Defendants' counsel, a copy of the foregoing will be served this date by electronic mail with a follow-up hard copy by USPS upon counsel for Defendants by written agreement of the parties.

Respectfully Submitted,

/s/ David Yerushalmi
David Yerushalmi